AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Wayne Anthony Grant, Jr.<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>)    5:21-mj-1029-PRL<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __February 4, 2021__ in the county of __Sumter__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sec. 201(b)(2) | Bribery of a Public Official |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

JOSE VAZQUEZ
Digitally signed by JOSE VAZQUEZ
Date: 2021.02.11 16:48:03 -05'00'

*Complainant's signature*

Special Agent Jose Vazquez, DOJ OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 02/11/2021

*P. Lammens*

*Judge's signature*

City and state: Ocala, Florida     Philip R. Lammens, U.S. Magistrate Judge
*Printed name and title*

STATE OF FLORIDA                                CASE NO. 5:21-mj-1029-PRL

COUNTY OF MARION

### AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Jose Vazquez, being duly sworn and appointed a Special Agent with the Department of Justice, Office of the Inspector General (DOJ OIG), hereby make the following statement in support of the attached criminal complaint:

### INTRODUCTION

1. I am a Special Agent with the DOJ OIG and have been since August 2020. I have been employed as a federal law enforcement officer since 2003, previously serving as a Special Agent with the U.S. Department of Energy, OIG and the U.S. Postal Service, OIG. I am currently assigned as the Ocala Domicile agent with DOJ OIG.

2. I submit this affidavit in support of a criminal complaint charging Wayne Anthony Grant, Jr. (GRANT) with the offense of bribery of a public official, in violation of 18 U.S.C. § 201(b)(2). As described herein, GRANT is a United States Bureau of Prisons (BOP) corrections officer (CO) at the Coleman Federal Correctional Complex (Coleman) in Sumter County, Florida.[1] As a BOP CO, GRANT is a public official as defined under 18 U.S.C. § 201(a)(1).

3. This affidavit is based upon my own investigation of this case, as well as the investigation conducted by other coordinating law enforcement agencies. Because

---

[1] Coleman is a federal prison. It is located within the Middle District of Florida.

this affidavit is intended to show only that there is probable cause for the arrest of the defendant, however, it does not contain every fact known to me or developed during this investigation.

## PROBABLE CAUSE

4. During my investigation of this case, I have spoken with a cooperating witness (CW) who claimed to have knowledge of possible criminal violations involving GRANT. The CW is an associate of an inmate (Inmate #1) who is serving a federal prison sentence at Coleman.[2] According to the CW, Inmate #1 allegedly met GRANT while he worked as a CO in the same housing unit as Inmate #1. Inmate #1 was approached by GRANT about facilitating the introduction of contraband (subsequently determined to be methamphetamine) into Coleman. Inmate #1 agreed to GRANT's proposition, but subsequently contacted the CW and requested that he/she contact federal authorities. Inmate #1 also provided the CW's phone number to GRANT in order to help facilitate the transaction.

5. On or about December 7, 2020, GRANT contacted the CW via text messages and phone calls from phone number (631) XXX-4236. In those contacts, GRANT explained to the CW that he wished to coordinate the shipment of the contraband to a post office box and receive an initial payment in the amount of $4,000 in United States currency in exchange for bringing the contraband into Coleman.

---

[2] Based on the facts outlined in this affidavit law enforcement determined that the CW's information was reliable and credible.

GRANT provided the CW with Inmate #1's nickname in order to corroborate his identity as the person who would introduce the contraband into the prison.

6. GRANT asked that the CW provide the initial payment via an electronic funds transfer application, such as "Zelle" or "Cash-App." Zelle and Cash-App are services that allow users to electronically transfer funds. GRANT provided the CW with phone number (407) XXX-1397.[3] This was the number associated with the account into which he requested the transfer of the funds. GRANT also provided the CW with P.O. Box 617103 in Orlando, Florida as the address to send the contraband.

7. On or about December 23, 2020, I interviewed Inmate #1. Inmate #1 alleged that GRANT was providing inmates with contraband items, such as cell phones and controlled substances, by smuggling the items into the prison in return for monetary payments. Inmate #1 confirmed that GRANT quoted him a price of $15,000 (with an initial payment of $4,000) in exchange for smuggling methamphetamine into Coleman. Inmate #1 also informed me that GRANT previously had provided another inmate with a substance that was purportedly methamphetamine but turned out to be fake. Inmate #1 confirmed that he provided GRANT with the CW's telephone number as the point of contact to help arrange the transaction. Inmate #1 confirmed that he advised the CW that GRANT may contact him/her but that the CW should also contact federal authorities about GRANT's activities.

---

[3] I have been able to confirm that GRANT provided this same number to the BOP in his employment records as his contact number.

8. On or about January 13, 2021, I informed Inmate #1 and the CW that I intended to introduce an undercover agent (UA) to GRANT for the purpose of completing the transaction. Inmate #1 and the CW agreed to assist the investigation by passing a phone number assigned to the UA to GRANT. On or about January 17, 2021, I provided phone number (601) XXX-9075 to the CW. This was the UA's assigned phone number. The CW provided this number to GRANT via text message and advised GRANT of the UA's cover name, "Tommy."[4]

9. During my investigation of this case, I have learned that inmates are sometimes able to receive paper items that are soaked in various controlled substances in a liquid form. The paper is then disguised as letters, photographs, or other correspondence. I have learned from various sources, including inmates within Coleman, that the process requires soaking the paper in a liquified controlled substance (such as methamphetamine) and then allowing the paper to dry. This process is repeated until the paper completely absorbs the controlled substance. Inmates can smoke or otherwise use the papers to release the substance into their systems. This method of hiding the controlled substance can be difficult to detect by prison officials, especially if the papers are introduced to the facility by BOP employees. As described below, this is the process by which GRANT agreed to smuggle methamphetamine into Coleman.

---

[4] Inmate #1 informed GRANT that another party would be needed to complete the transaction.

4

10. On or about January 18, 2021, GRANT started contacting the UA. GRANT continued to use phone number (631) XXX-4236. From on or about January 18, 2021 to February 4, 2021, the UA and GRANT conducted several recorded phone conversations and exchanged text messages. During these conversations, GRANT and the UA discussed the details of a transaction which would conclude with GRANT providing papers soaked in methamphetamine to Inmate #1 in exchange for a total payment of $4,000.[5] The UA agreed to mail the papers to a post office box of GRANT's choosing. The UA agreed to pay GRANT an initial payment of $2,000 and GRANT requested an additional $2,000 payment once he received the papers. The UA informed GRANT that the total amount of methamphetamine would be approximately 60-70 grams.

11. GRANT further requested that the UA send the papers to P.O. Box 617103, in Orlando, Florida. This is the same address that GRANT previously described to the CW. On or about January 23, 2021, the UA informed GRANT that he was preparing the shipment along with the first payment. Though GRANT had previously requested that the payment be made via Zelle or Cash-App, the UA informed GRANT that the payment would be via money order. The UA told GRANT that the package would be addressed from "Kim Price" at 3123 23rd Avenue, in

---

[5] It was clear from these conversations that GRANT was familiar with the concept of soaking controlled substances into papers. For instance, in one exchange, the UA told GRANT to "be careful because the papers are going to be dipped in meth, so if you touch it with your bare hands, you may start tripping." GRANT replied, "I already know, you ain't got to tell me."

Gulfport, Mississippi. GRANT requested that the package be sent to another person named "R.C." at the previously described P.O. Box.[6]

12. Having learned about the process of preparing papers soaked in a controlled substance, I began creating the papers to send to GRANT. Rather than using real methamphetamine, I decided to create "sham" papers soaked in a mixture of salt, acetone, and paint thinner in order to simulate the appearance of methamphetamine. I performed the process of dipping the sheets of paper into the substance, letting them dry, and repeating until all of the substance was absorbed. This was done with 20 sheets of paper. Each sheet absorbed between approximately three to five grams of the substance per sheet, for a total of approximately 70 grams of sham methamphetamine.[7]

13. In order to identify the sheets of paper, various images were printed on them. These included housing ad listings that I familiarized myself with and documented as part of my investigation. A unique metallic pattern was also incorporated at the upper-left and bottom-right corners on the back of the papers so that they could be identified. Photographs of one of the sheets are included below:

---

[6] A records search with the Florida Department of Motor Vehicles (DMV) revealed that R.C. resides at an address located on Cypress Street, in Orlando, Florida. The DMV lists this same address for GRANT. Additionally, GRANT provided this address in his BOP employment records.

[7] I measured the amount by placing the salt into a digital scale prior to dissolving it into the acetone and paint thinner.

*Front of one of the sham methamphetamine soaked sheets of paper.*



*Back of the sheet.*



14. On or about February 2, 2021, GRANT was informed by the UA that the process had been completed and the package would be sent with tracking number EJ613213368US. The UA told GRANT that the parcel contained two $1,000 money orders and described the contents of the package. This included two clear folders containing 10 sheets each of the previously described papers.

15. On or about February 3, 2021, I met with United States Postal Service Inspector Kenneth Guttman at the USPS Orlando Post Office where GRANT had requested that the package be delivered. The package containing the papers was sealed and labeled and a parcel arrival notification slip[8] was placed inside of P.O. Box 617103.

16. On or about February 3, 2021, GRANT arrived at the USPS Orlando Post Office and retrieved the parcel arrival notification slip from P.O. Box 617103. GRANT provided the notification at the USPS Orlando Post Office counter and was given the package by Inspector Guttman. I observed and video-recorded GRANT coming out of the USPS Orlando Post Office with the package.[9] GRANT then left the location in a Chevrolet Camaro (Florida Tag number PCD-X25). DMV records indicate that this vehicle is registered to GRANT.

---

[8] This slip notifies a USPS customer that the package that he or she has received must be picked up at the counter.

[9] As part of my investigation, I reviewed GRANT's BOP and DMV records relating to his height, weight, and overall appearance. Using these records, I familiarized myself with GRANT's appearance, including a distinctive birthmark or scar that is located on his forehead. Based on this and his other identifying characteristics, I was able to identify GRANT as the individual who was carrying the package.

8

17. On or about February 3, 2021, GRANT called the UA and advised that he had received the package and confirmed that he had the papers. GRANT requested an additional payment of $2,000 to bring the sheets inside of Coleman and provide them to Inmate #1. Rather than provide this payment, the UA negotiated with GRANT based on purported costs that the UA had already incurred during the process. GRANT ultimately agreed to bring half of the sheets (10) into Coleman and provide them to Inmate #1 before receiving the second payment. GRANT confirmed that he would do this during his assigned shift on or about February 4, 2021.

18. On or about February 4, 2021, I met with Inmate #1 inside a secure location at Coleman. I advised Inmate #1 of GRANT's plan to make contact with him and deliver the papers on that date. Inmate #1 was also shown a photograph of GRANT from the video surveillance at the Orlando Post Office. Inmate #1 identified the individual in the photograph as GRANT. Inmate #1 agreed to complete the transaction with GRANT on that date.

19. On or about February 4, 2021, BOP SIS confirmed GRANT's arrival at Coleman. GRANT made contact with Inmate #1 in a BOP office located in a common area of the facility. No other persons were located inside of the office at the time of the interaction. BOP security cameras were used to record the interaction. Inmate #1 was also equipped with an audio recording device.

20. Prior to entering the office, GRANT could be heard telling Inmate #1, "I got it." GRANT also provided Inmate #1 with the name "Tommy." Inmate #1 entered the office with a stack of papers. He placed them on a desk for a moment as

he picked up the sheets of papers purportedly soaked in methamphetamine. Inmate #1 left the office with the papers. He was monitored and later escorted by BOP officials to a secure location.

21. After this process was completed, I interviewed Inmate #1. Inmate #1 stated that GRANT had provided him with the papers and asked him to call the UA to request that an additional payment be made in order for him to bring the rest of the papers into Coleman. Inmate #1 provided me with the 10 sheets of paper provided by GRANT. Inmate #1 indicated that he picked up the papers from the desk in the office by instruction from GRANT who signaled the location of the papers to Inmate #1. Based on my familiarity with them, I was able to confirm that these were the papers that I had created.

## CONCLUSION

22. Based on the above, I believe there is probable cause that GRANT committed the criminal offense of bribery of a public official, in violation of 18 U.S.C. § 201(b)(2).

This concludes my affidavit.

**JOSE VAZQUEZ**
Digitally signed by JOSE VAZQUEZ
Date: 2021.02.11 16:23:37 -05'00'

Jose Vazquez
Special Agent
Department of Justice
Office of the Inspector General

Subscribed and sworn to before me this 11th day of February 2021.

*P. Lammens*

The Honorable Philip R. Lammens
United States Magistrate Judge

11